UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


MARGARET JANE KINNETT, *et al.*,

        Plaintiffs,

v.                                  Case No. 8:10-cv-2317-T-23MAP
                                              8:10-cv-2728-T-23MAP
                                              (CONSOLIDATED)


STRAYER EDUCATION, INC., *et al.,*

        Defendants.

_____/


## REPORT AND RECOMMENDATION

      The Oklahoma Firefighters Pension and Retirement System, as designated Lead Plaintiff (hereinafter Plaintiff), brings this consolidated securities fraud class action lawsuit individually and on behalf of a class of purchasers of Strayer Education Inc.'s ("Strayer") common stock between November 1, 2007, and January 7, 2011. Plaintiff asserts its claims under the Private Securities Litigation Reform Act ("PSLRA") alleging Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5") (doc. 40). Defendants move to dismiss the Consolidated Amended Complaint ("Amended Complaint") arguing Plaintiff has failed to state a claim for securities fraud under Rule 12(b)(6) and failed to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. For the reasons that follow, I recommend Defendants' motion to dismiss the Amended Complaint (doc. 44) be granted.[1]

---

[1] The district judge referred the matter to me for a Report and Recommendation (doc. 53). *See* 28 U.S.C. § 636 and Local Rule 6.01.

*A. Background* [2]

Strayer operates 89 for-profit, post-secondary education institutions across the country offering both undergraduate and graduate degree programs via traditional classroom courses and online via the Internet through its wholly-owned subsidiary, Strayer University, Inc. ("Strayer University"). Amended Complaint ¶ 2; doc. 45, Declaration of Joni Ostler ("Ostler Declaration), Exh. 1 at 2.[3] Defendant Robert S. Silberman ("Silberman") has served as Chairman of the Board and Chief Executive Officer of Strayer since 2000; Defendant Karl McDonnell ("McDonnell") has served as President and Chief Operating Officer of Strayer since 2006; and Defendant Mark C. Brown ("Brown") has served as Chief Financial Officer of Strayer since 2001. Amended Complaint ¶¶ 17-19; Ostler Declaration, Exh. 1 at 73. Strayer's stated mission is to "make higher education achievable and convenient for working adults." Amended Complaint ¶ 2; Ostler Declaration, Exh. 1 at 2. To that end, Strayer enrolled more than 60,000 students as of the 2010 fall quarter. Ostler Declaration, Exh. 1.

Strayer derives approximately 95% of its revenue from student tuition payments. Amended Complaint ¶¶ 3, 45. More than 70% of Strayer's students receive their tuition payments by way of federal financial aid programs available through Title IV of the Higher Education Act ("Title IV").

---

[2] Accepting all well-pleaded facts in the amended complaint as true and construing all reasonable inferences therefrom in the light most favorable to Plaintiff, the undersigned assumes the following facts. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd., et al.*, 551 U.S. 308, 322 (2007) (stating that when a court considers a Rule 12(b)(6) motion to dismiss a securities fraud action, it must accept all factual allegations in the complaint as true); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (addressing the applicable standard for a motion to dismiss a complaint in a securities class action lawsuit).

[3] Citations to the Ostler Declaration filed in support of Defendants' motion to dismiss (doc. 45) are incorporated into the background discussion as set forth in n. 4, *infra*.

Amended Complaint ¶¶ 3, 50; Ostler Declaration, Exh. 23 at 27. To sustain its eligibility to participate in federal student financial assistance programs, Strayer must receive and maintain accreditation by an entity approved by the Department of Education ("DOE"). Ostler Declaration, Exh. 1 at 14. Strayer is currently regionally accredited by the Middle States Commission on Higher Education, an accrediting agency approved by the DOE. *Id.* As an institution of higher education accredited by the Middle States Commission on Higher Education, Strayer must comply with accreditation rules and various state licensing and regulatory requirements. *Id.* at 13. Further, as an institution of higher education participating in the various financial aid programs available under Title IV, Strayer must also comply with the mandates of Title IV and the regulations promulgated thereunder, which require Strayer to, among other things, meet detailed substantive and reporting requirements as well as undergo periodic regulatory scrutiny. Amended Complaint ¶ 51; Ostler Declaration, Exh. 1 at 13-14. If Strayer fails to comply with the regulatory standards governing Title IV programs, the DOE could impose one or more sanctions, including but not limited to requiring repayment of certain Title IV funds, referring the matter for criminal prosecution, or initiating proceedings to impose a fine or to limit, condition, suspend or terminate Strayer University's participation in Title IV programs. Ostler Declaration, Exh. 23 at 25; *see* Amended Complaint ¶ 52.

Over the past couple years, the DOE has expressed concern with the quality of education offered at for-profit schools and the amount of debt accumulated by students who attend for-profit schools. Amended Complaint ¶ 53. Indeed, in November 2009, the DOE convened two rule-making committees to develop new regulations relating to issues affecting for-profit schools with the new rules proposing more stringent safeguards than required by the prior rules to protect students from misrepresentations. *Id.* at ¶¶ 54-55. More importantly, in the summer of 2010, the Government

Accountability Office ("GAO") began investigating the recruiting, admissions and financial aid practices at a number of for-profit education institutions. *Id.* at ¶¶ 95-99. On August 4, 2010, the GAO issued a report with its findings but noted the institutions investigated were not a representative sample and the results could not be projected to other for-profit education institutions. Amended Complaint ¶ 99; Ostler Declaration, Exh. 3. As indicated in the report, the GAO did not investigate any admissions practices at Strayer or name Strayer in the report. Ostler Declaration, Exh. 4 at 6-7.

Notwithstanding, in August 2010, Congress issued subpoenas to Strayer and 29 other for-profit education institutions seeking information regarding how the schools recruit and enroll students, set tuition, handle withdrawal of students and return of federal funds, and manage compliance with Title IV in order to compare those practices across the sector. Ostler Declaration, Exh. 15. Around the same time, the DOE notified Strayer it would conduct a program review of Strayer's administration of Title IV programs. Amended Complaint, ¶ 100; Ostler Declaration, Exh. 1. The DOE had previously conducted a program review of Strayer in 2008, which resulted in no material findings. Ostler Declaration, Exh. 1 at 25.

After the issuance of the GAO Report, Strayer's new student enrollments declined. Amended Complaint ¶ 7. On October 28, 2010, per its usual practice, Strayer released a press release announcing its financial results for the third quarter ending September 30, 2010. *See* Amended Complaint ¶¶ 15, 45, 56; Ostler Declaration, Exh. 16. For that quarter, new student enrollment decreased by 2% while overall enrollment for the fall term increased by 12%. Amended Complaint ¶ 6; Ostler Declaration, Exh. 16. At that time, Strayer also announced its projected 2011 Business Model reflecting its plan for expansion and an increase in tuition as well as predicting roughly stable operating margins assuming a 13% increase in annual student enrollment. Amended Complaint ¶

4

8; Ostler Declaration, Exh. 16.

On January 7, 2011, however, Strayer announced its new student enrollments actually decreased by 20% with only 4% overall student enrollment growth for the winter term. Amended Complaint ¶ 196; Ostler Declaration, Exh. 18. Strayer further disclosed that its previous annual student enrollment growth scenario of 13% would not be reached and therefore provided investors with additional information regarding its 2011 Business Model. Amended Complaint ¶ 196; Ostler Declaration, Exh. 18. The additional information included the impact on revenue growth, operating margin and earnings per share for enrollment growth scenarios of -5% growth, 0% growth and 5% growth as compared to the 13% originally announced. Amended Complaint ¶ 196; Ostler Declaration, Exh. 18.

Following that, on January 10, 2011, Strayer held a conference call with investors to discuss the January 7, 2011, announcement. Amended Complaint ¶ 198; Ostler Declaration, Exh. 19. During the conference call, Silberman discussed with investors the projected impact of what lower rates of enrollment growth for the full year would have on the 2011 Business Model. Amended Complaint ¶ 198; Ostler Declaration, Exh. 19. He also touched upon the potential reasons for the decline noting that the negative publicity of the past few months may have played a major part in the decline in enrollment numbers as well as the fact that Defendants had been "somewhat distracted internally here over the last two months just in dealing with some of the ramifications of not just the publicity but the actual government activity." Amended Complaint ¶ 199; Ostler Declaration, Exh. 19. That day, the price of Strayer common stock fell from a closing price on January 7, 2011, of $153.24 per share to $118.60 per share. Amended Complaint ¶ 202.

Subsequently, Plaintiff, individually and on behalf of a class of purchasers of Strayer's

common stock between November 1, 2007 and January 7, 2011 (the "class period"), filed the Amended Complaint pursuant to the PSLRA alleging violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants and § 20(a) of the Securities Exchange Act against Silberman, Brown and McDonnell (collectively, the "Individual Defendants"). Specifically, Plaintiff alleges Defendants made false and misleading statements and failed to disclose adverse facts known to them about Strayer relating to student enrollment and growth, the 2011 Business Model, and the degree of control exerted by Defendants over enrollment as well as purported changes implemented after issuance of the GAO report. According to Plaintiff, Defendants' fraudulent scheme and course of conduct operated as a fraud upon purchasers of Strayer common stock in that it deceived the investing public about Strayer's student enrollments, artificially inflated the price of Strayer common stock, and caused Plaintiff and other class members to purchase Strayer common stock at artificially inflated prices and suffer economic loss when the true state of affairs was revealed and reached the market. Amended Complaint ¶¶ 21, 252-60. Further, Plaintiff asserts a derivative claim pursuant to § 20(a) of the Securities Exchange Act against the Individual Defendants alleging they exercised power as "control persons" to cause Strayer to engage in these illegal practices. *Id.* at ¶¶ 261-64.

Defendants cite a host of reasons for dismissing the Amended Complaint: the failure to allege essential elements of fraud; the failure to meet the heightened pleading demands of the PSLRA; the failure to allege scienter; the lack of facts suggesting that senior officers knew about the fraud; and the failure to adequately allege loss causation. The absence of any one of these elements, say Defendants, warrants dismissal; however, taken together, they render the Amended Complaint "fundamentally and incurably defective." *See* doc. 44 at p. 2.

6

*B. Standard of Review*

A complaint setting forth a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2)*; Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss need not include detailed factual allegations, the plaintiff must provide the grounds of its entitlement to relief, meaning more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Id.* Instead, a complaint must allege enough facts to state a claim for relief that is plausible on its face. *Id.* at 570.

When considering a Rule 12(b)(6) motion to dismiss a securities fraud action, courts must accept all well-pleaded factual allegations in the complaint as true. *Tellabs,* 551 U.S. at 322. Courts must consider the complaint in its entirety and may also consider matters of which a court may take judicial notice. *Id.* For example, courts may take judicial notice of relevant documents publicly filed with the SEC, records of stock prices on a given day, and other public records. *Bryant,* 187 F.3d at 1278, 1280 (holding courts may take judicial notice of relevant public documents required to be filed with the SEC and actually filed with the SEC as well as other matters of public record); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 631 n. 5 (11th Cir. 2010) (citing *Bryant, supra*); *La Grasta v. First Union Secs., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004)(finding stock prices on a given date not subject to reasonable dispute and, therefore, a proper subject for judicial notice). Further, courts may consider documents attached by a defendant to a motion to dismiss which are both central to the plaintiff's claim and are undisputed as to the authenticity of the documents. *Day v. Taylor*, 400

F.3d 1272, 1276 (11th Cir. 2005); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).[4]

To survive a motion to dismiss in a securities fraud case, however, a plaintiff must meet heightened pleading standards, including Rule 9(b)'s requirement that the circumstances constituting fraud be stated with particularity. Fed. R. Civ. P. 9(b); *Mizzaro v. Home Depot Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). The pleading requirements of Rule 9(b) are satisfied where the complaint sets forth the following:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id.* (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)). Essentially, the plaintiff must allege the who, what, when, where, and how. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

Additionally, private plaintiffs alleging securities fraud claims must meet the more exacting pleading demands of the PSLRA.[5] The PSLRA requires securities fraud complaints to specify each misleading statement; set forth facts on which a belief that a statement is misleading is formed; and state with particularity the facts giving rise to a strong inference that the defendant acted with the requisite state of mind. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (citing 15 U.S.C.

---

[4] For example, Defendants ask the Court take judicial notice of documents incorporated by reference into the complaint, documents filed with the SEC, other matters of public record, and records reflecting stock prices, economic conditions, and market trends (doc. 46). *See* Fed. R. Evid. 201(b)-(d). Plaintiff does not object to Defendant's request. Accordingly, I have considered each of the exhibits.

[5] "The PSLRA applies to private actions seeking relief on the basis of alleged violations of ... the Securities Exchange Act of 1934." *Thompson*, 610 F.3d at 631 n. 3 (citing 15 U.S.C. § 78u-4(c)).

§ 78u-4(b)(1)).  "To qualify as 'strong' ... an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Findwhat Investor Group v. Findwhat.com*, 658 F.3d 1282, 1300 (11th Cir. 2011) (quoting *Tellabs,* 551 U.S. at 314).  Failure to meet the pleading requirements of the PSLRA mandates dismissal of the complaint on the motion of any defendant.  15 U.S.C. § 78u-4(b)(3)(A).

### C. Discussion

#### 1. Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act makes it unlawful

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility or any national securities exchange ... [t]o use or employ in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Pursuant to its authority under § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful for any person, directly or indirectly "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ..." in connection with the purchase or sale of securities.  17 C.F.R. § 240.10b-5(b); *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2301 (2011).  Neither § 10(b) or Rule 10b-5 creates a private right of action.  *Janus*, 131 S.Ct. at 2301.  Nevertheless, the Supreme Court has found a private right of action implied in the words of § 10(b) and its implementing regulation, Rule 10b-5.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13, n. 9 (1971)).  To state a private cause of action

for damages sustained as a result of a violation of § 10(b) and Rule 10b-5, the plaintiff must allege: (1) a material misrepresentation or omission by the defendant, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff relied, and (5) which was causally connected to (6) the plaintiff's economic loss. *Dura*, 544 U.S. at 341-42; *Thompson*, 610 F.3d at 633. As already noted, Defendants contend the Plaintiff's allegations are inadequate regarding the material misrepresentations or omissions, scienter, and loss causation.

*a. materially false statements or actionable omissions*

To prevail on a § 10(b) and Rule 10b-5 claim, a plaintiff must first establish the defendant made a material misrepresentation or omission. *Dura*, 544 U.S. at 341-42; *Thompson*, 610 F.3d at 633. The PSLRA adds a more demanding burden on a plaintiff. Namely, any plaintiff who alleges a defendant made a misrepresentation or omission as to a material fact must specify in the complaint each statement alleged to have been misleading, the reasons why the statement is misleading, and, if the allegation is made on information or belief, to state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1). A plaintiff can satisfy the materiality requirement by demonstrating a substantial likelihood that a reasonable investor would view the disclosure of the misrepresented or omitted fact as having significantly altered the total mix of information made available. *Matrixx Initiatives, Inc. v. Siracusano*, __ U.S. __, 131 S.Ct. 1309, 1318 (2011).

Plaintiff contrasts what the Defendants knew against what they told the investing public. Honing in on three categories of statements, Plaintiff contends Defendants materially misled investors about: (1) student enrollment growth attributions to such factors as the opening of new campuses or the quality of the programs offered; (2) Strayer not pushing, managing or controlling enrollment numbers; and (3) Strayer's 2011 Business Model announced on October 28, 2010. In

reality, Defendants knew enrollment numbers drove profits; they set unrealistic enrollment goals to meet unrealistic growth projections; and they aggressively pushed their managers to meet these targets.

Defendants argue otherwise. These statements, they assert, were about historic growth and were not misleading. Likewise, Defendants did not mislead when saying Strayer did not control student enrollment. In short, Defendants deny these statements and those in its 2011 Business Model are actionable (doc. 44 at 6-14).

*i. student enrollment numbers and growth*

The thrust of Plaintiff's suit is that Defendants knew or recklessly disregarded the fact that student enrollments were not because of new campuses or quality programs. Amended Complaint ¶125. Instead, "unbeknownst to its investors, the reported quarterly and year-end enrollment figures were the result of enforcing Defendants' quotas and the use of improper and unethical enrollment practices." *Id.* Plaintiff points to the accounts of 15 confidential sources ("CS"), all former Strayer employees, to support this theme. Most served in admissions as an officer, manager, or director. The remainder had other titles: student account representative, financial aid representative, business office manager, student support director, adjunct professor, and campus dean. All these represented campuses in Florida, Georgia, Maryland, New Jersey, North Carolina, Pennsylvania, and Virginia. And one, CS 10, worked at corporate headquarters as Strayer's human resource director. Implicit from this geographical breadth, at least from Plaintiff's perspective, is that the accounts point to a corporate-wide experience. *See id.* at ¶¶ 28-43, 56-94.

The CS statements broadly show a pattern of conduct during the class period: inflating enrollment numbers by enrolling individuals who had never agreed to enroll at Strayer; boosting

enrollment by taking unqualified students; and misleading students about financial aid to secure their admission and thereby increase the enrollment figures. *Id.* at ¶¶ 70-94. All this, says Plaintiff, made Strayer's references to enrollment and growth numbers inaccurate and misleading. Had the investing public known about Strayer's recruiting methods, investors would have acted differently. *See id.* at ¶ 125.

Defendants counter that Plaintiff's allegations do not satisfy its burden of showing that the allegedly improper conduct was widespread to the extent necessary to render Strayer's public statements materially misleading. More specifically, Defendants argue that allegations of isolated employee misconduct do not render Strayer's statements regarding historic student enrollment numbers and growth misleading. Besides, Strayer's alleged use of enrollment goals is both proper and immaterial and does not render any statement regarding student enrollment and growth misleading (doc. 44 at 6-12).

Notably, most CS statements, save those describing the institutional pressure to increase enrollment, offer opinions or secondhand accounts.[6] For example, the CSs offer personal opinions

---

[6] *See, e.g.,* Amended Complaint ¶ 67 ("CS 9 said that the strategy for student enrollment at Strayer University was based solely on achieving quotas, no matter the means taken. According to CS 9, beginning in 2008 and continuing through June 2010, the Strayer University Takoma Park campus engaged in a series of fraudulent practices in order to bring students in the door: 'We conned and scammed them and brought all this debt on them.' According to CS9, the fraudulent practices were implemented at the direction of the Campus Director."); ¶ 68 ("According to CS 10, in a given year, 55% to 65% of admissions officers at Strayer were fired because of their failure to make registration quotas."); ¶ 69 ("CS 11[] believed that Strayer's enrollment quotas were much higher and more aggressive than those at other for-profit schools. CS 11 previously worked at DeVry for five years before coming to Strayer and his quarterly quotas there were between fifteen to eighteen new student starts as opposed to between thirty-eight and forty-five registrations at Strayer. Referring to Strayer's quotas, CS 11 stated that '[t]he numbers were absurd ... I had friends working at other [for-profit] schools and it was all pretty much in the same ballpark [as DeVry's quotas]. They said to me, 'What do you mean you got to do forty-five? That's insane. How can you do that many people?' And it was insane. ...'"); ¶

as to the impropriety of some of the recruitment and enrollment practices used by unnamed Strayer employees.[7] While the use of a CS is permissible in a fraud complaint, the pleader must fully describe "the foundation or basis of the confidential witness's knowledge, including the position(s)

---

72 ("CS 12 learned from speaking with admissions staff that under the direction of the Campus Director, Strayer frequently enrolled students 'who weren't supposed to be enrolled.' CS 12 estimated that 30% of enrollments at this Strayer University campus consisted of students who did not consent to enrolling at Strayer. ..."); ¶ 73 ("CS 7 stated that '[t]here have been times when students wanted to withdraw, were never withdrawn, and were charged anyway. A student would say, 'I don't want to attend; drop me.' But they wouldn't be dropped.'"); ¶ 82 ("CS 7 stated that in order to 'inflate enrollment numbers,' the campus director at Strayer University at King of Prussia, Pennsylvania recruited 'students' at homeless shelters and halfway houses without regard to academic capability. 'He was going out and bringing these people back, and they would have absolutely no idea what they were doing.'"); ¶ 84 ("According to CS 1, 'Strayer doesn't pick and choose their students. They let anybody enroll. Some people go to school just for a refund check. After their tuition is paid and they get their remaining money, then they drop. ... Strayer is all about money and numbers ... as long as they got paid, it didn't matter if the students took off.'"); ¶ 111 ("... CS 10 heard from other staff in the Employee Relations Department that these changes were in direct response to a new round of reports of regulatory and congressional scrutiny that month."); ¶ 112 ("... CS 10 believed that everyone at Strayer knew Strayer's reforms were about cleaning house as a result of government scrutiny.").

    [7] *See, e.g.,* Amended Complaint ¶ 72 ("CS 12 learned from speaking with admissions staff that under the direction of the Campus Director, Strayer frequently enrolled students 'who weren't supposed to be enrolled.' CS 12 estimated that 30% of enrollments at this Strayer University campus consisted of students who did not consent to enrolling at Strayer. These enrollments were derived from potential students who had made only initial inquiries ... But the campus' Business Office, acting in concert with the Campus Director, 'went ahead and finalized the students without them knowing it and without them paying anything,' thereby keeping the fictitious enrollments. According to CS 12, this practice occurred because '[i]f the Business Office Manager does not go with the flow, he or she gets fired.'"); ¶ 80 ("CS 13 stated '[t]he academic integrity of the for-profit schools is not what it is in the traditional schools .... Because of pressure to recruit students, you recruit those who are not really qualified. At best, they ought to be going to community colleges – not a four-year, degree-granting institution, which Strayer is. They're not academically prepared."); ¶ 81 ("According to CS 14, Strayer was 'always after the numbers.' The quality of the student was not a primary concern. In fact, CS 14 resigned from Strayer in June 2010 due to Strayer's routine admission of students who were not capable academically – a practice he felt was not in the best interest of students. ..."); ¶ 83 ("CS 9 stated that Admissions Officers at his campus pursued recruits by telling them, if you 'go to school, you'll get a check.' In several instances, CS 9 observed homeless people being enrolled and filling out Free Application for Federal Student Aid forms ('FAFSA').").

held, the proximity to the offending conduct, and the relevant time frame." *Mizzaro*, 544 F.3d at

1240. Plaintiff includes the relevant background information for each CS but generally fails to detail

each CS's personal knowledge for the assertions each makes. As *Mizzaro* counsels, the weight a

court should afford a CS's account depends upon the particularity of the CS's allegations in that

account. *Id.*[8]  Moreover, opinions do not transform non-fraudulent practices, such as re-enrolling

students with an outstanding balance (Amended Complaint ¶ 90), into fraudulent or misleading

actions. *See In re Mirant Corp. Sec. Litig.* 1:02-cv-1467-RWS, 2009 WL 48188 *18 (N.D. Ga. Jan.

7, 2009) ("The blanket characterization of business transactions as illegal does not make them so,

nor does alleging their non-disclosure necessarily state a valid Securities Act or Exchange Act

violation."). Accordingly, statements such as these do nothing to bolster Plaintiff's contentions or

to establish a fraudulent statement or actionable omission regarding historic student enrollment

numbers and growth. *See generally Mizzaro*, 544 F.3d at 1239-40 (noting courts may be skeptical

of confidential sources cited in a securities fraud complaint; the securities fraud complaint must

---

[8]  To the extent the CS statements offer personal knowledge, Plaintiff has not alleged that
the purportedly improper conduct is proscribed by Title IV or any other statutory or regulatory
scheme.  Further, those allegations reportedly based on personal knowledge are not plead with
the requisite level of specificity.  For example, CS 7 "observed" that some students "had not been
fully informed about how much their tuition was going to cost," "did not understand their
repayment obligations" under Title IV, and "knew what the cost was per class" but not for the
entire four-year degree program, and CS 8 stated admissions representatives avoided telling
students the how much the degree would cost them.  Amended Complaint ¶¶ 85-86.  Plaintiff
does not allege that Strayer failed to provide these students with written or oral information
regarding their repayment obligation of Title IV loans but rather alleges that the students did not
understand the obligations. The students' failure to understand their obligation does not translate
into any wrongdoing on the part of Strayer.  Further, as CS 7's statement indicates, the students
received information regarding the cost per class.  Plaintiff does not allege that the students were
not informed about the classes required to obtain a degree.  Although Strayer admissions staff
may have omitted directly stating a total dollar figure for a degree, that omission did not amount
to fraud as students were given information from which they could determine, with minimal
effort, the cost of a degree.

"unambiguously provide[] in a cognizable and detailed way the basis of the [confidential source's] knowledge").  As such, Plaintiff has failed to allege a material misrepresentation or omission with respect to student enrollment numbers and growth.

*ii. control of student enrollment*

Plaintiff alleges Strayer assigned enrollment targets, which Plaintiff contends were absurdly high; used various systems to monitor enrollment, drop, completion, and graduation statistics; and created daily reports tracking enrollment numbers.  For example, "Host Access" allowed corporate to track enrollment, drop, completion, and graduation throughout the system.  The "Admissions Officers Daily Report" tracked daily enrollment numbers and ranked admissions officers by the quantity of their enrollments.  Amended Complaint ¶¶ 47-49.  Monitoring and reviewing enrollment numbers and setting performance goals for employees, however, does not equate to pushing or controlling enrollment numbers.  Strayer, like any other educational institution,  had legitimate business reasons to track enrollment numbers, including determining the number of teachers to hire, courses to offer, and campuses to open as well as areas to focus its marketing efforts.  Additionally, as student tuition provided one of its main sources of income, Strayer, as would any other business, sought to maximize its income and push its employees to increase enrollment numbers.  Although some CSs felt the goals exceeded what they believed were reasonable, not one stated the goals were in fact unattainable absent improper means or that performance goals or quotas were an inappropriate measure of employee performance.  *See id.* at ¶¶ 56-69.

Further, Strayer reported enrollment information to its investors to keep them apprised of Strayer's financial situation.  To that end, during the class period, Strayer disclosed information regarding its enrollment numbers in its press releases and Form 10-Ks and discussed those numbers

15

during conference calls. *See, e.g.,* Ostler Declaration, Exhs. 16, 21, 23, 24, 27. Implicitly, if not explicitly, the disclosure of the enrollment information indicated Strayer had a system for monitoring and reporting enrollment numbers.

To the extent Strayer could "control" anything, it set goals for employees to reach in the recruiting and enrollment process. Even if Strayer used quotas or performance goals, nothing guaranteed its employees would achieve those goals because numerous other factors influenced student enrollment, such as the negative press surrounding the government activity with respect to the for-profit secondary education sector. Hence, Silberman repeatedly warned investors during conference calls that student growth could be volatile and unpredictable and depended upon factors outside of Strayer's control. *See* Amended Complaint ¶¶ 116, 128, 142, 155, 167, 174. For instance, with respect to the 2009 first quarter earnings, Silberman stated, in part,

> [W]e're quite comfortable that that new student growth can be somewhat volatile. It can go up and down. We're really not trying to manage that, and we are comfortable with and understand that the student who's most likely to succeed in the classroom is the one who's convinced themselves to enroll, and they're going to do that at different paces and at different times.

*Id.* at ¶ 155. Additionally, the 2009 Form 10-K explicitly warned investors that "[i]nvesting in our common stock involves a high degree of risk" and listed a number of risk factors related to the extensive regulation of the business as well as risks inherent to the business, most notably that Strayer may not be able to sustain enrollment growth and may not be able to manage future growth effectively. Ostler Declaration, Exh. 23 at 27-33. A reasonable investor would understand these statements to be, at best, cautionary rather than guarantees that enrollment numbers would reach any purported goals set by Defendants. On these facts, therefore, whether Strayer used performance goals or quotas is immaterial. Accordingly, the allegations in the Amended Complaint do not set

forth sufficient facts demonstrating Defendants' failure to disclose the use of goals or quotas constitutes a material fraudulent misrepresentation or omission.

### iii. 2011 Business Model

Plaintiff additionally alleges Defendants' announcement of its 2011 Business Model in the October 28, 2011, press release, which was premised on achieving a 13% increase in annual student enrollment, "was materially false and misleading when made because Defendants knew or recklessly disregarded that Strayer had materially reformed its recruiting practices in August of 2010, which had a negative and immediate effect on enrollments." Amended Complaint ¶ 192-93. Specifically, Plaintiff alleges

> 193. Defendant's announcement that its Business Model for 2011, which was premised on achieving a "13% increase in annual student enrollment[,]" was materially false and misleading when made because Defendants knew or recklessly disregarded that Strayer had materially reformed its recruiting practices in August of 2010, which had a negative and immediate effect on enrollments. According to CS 7, after the GAO report came out on August 4, 2010, "[e]nrollments dropped off significantly." ¶ 108; *see also* ¶¶ 101-12. The low enrollments were also tracked by Defendants through HOST Access, the Insight program, and the "Admissions Officers Daily Report." *See* ¶¶ 47-49. Indeed, Defendant Silberman conceded his and Defendant Brown's review of enrollment numbers in his prepared remarks on the 2007 third quarter earnings conference call. Additionally, Defendant McDonnell monitored enrollments and emailed Admission Officers who made their quotas throughout the Class Period.

*Id.* at ¶ 193. Plaintiff acknowledges that, in the same press release, Defendants disclosed a 2% decrease in new student enrollments but alleges this statement only "partially revealed that Strayer's enrollments were affected by the Company's internal reforms" while failing "to reveal that the Company had reformed its enrollment practices due to government scrutiny of for-profit schools and the full extent the reforms were having on student enrollments." *Id.* at ¶ 194. As a result, Plaintiff alleges the market artificially inflated the price of Strayer common stock. *Id.* at ¶ 195.

Defendants contend, however, the 2011 Business Model is not actionable because Plaintiff has alleged no facts showing the 2011 Business Model was false when made or that it lacked a reasonable basis. Indeed, looking at the facts in the light most favorable to Plaintiff and assuming Defendants implemented reforms to Strayer's enrollment practices after the GAO report, the allegations in the Amended Complaint do not establish that Strayer's 13% enrollment growth assumption would prove unattainable for 2011. In the October 28, 2010, press release announcing the 2011 Business Model, Strayer also announced it had achieved a 12% increase in overall student enrollment, a 17% increase in continuing student enrollment and a 18% increase in global online student enrollment for the fall 2010 term. Ostler Declaration, Exh. 16. The only decreased enrollment number Strayer announced consisted of new student enrollments, and that decrease was only 2%. *Id.* These numbers were released after Strayer allegedly implemented the purported changes to their recruitment and enrollment practices. Given Strayer's announced plans to open five new campuses as well as the growth in both its continuing student enrollment and global online student enrollment, Strayer had potential to attain its 13% overall enrollment growth despite a purported shift in focus on its new student enrollment practices. More importantly, Defendants explicitly stated that the enrollment percentages are not an expectation of what they think Strayer will do but rather what percentage enrollment growth is necessary to get to flat margins. *See, e.g.,* Ostler Declaration, Exh. 22 at 12. The Amended Complaint fails, therefore, to demonstrate that the 2011 Business Model was false or misleading when made or lacked a reasonable basis or, further, that any omission as to Strayer's change in enrollment practices made the 2011 Business Model false

or misleading.[9]  Accordingly, Plaintiff has failed to state a materially false statement or actionable omission and the Amended Complaint should be dismissed on this ground.

### b. Scienter

Even assuming Plaintiff properly plead a materially false statement or actionable omission, Plaintiff fails to establish Defendants acted with the requisite state of mind when making the purported material misstatements or omissions.  Section 78u-4(b)(2) requires a plaintiff alleging a securities fraud claim to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In the context of a private securities action, establishing scienter requires a showing of an intent to deceive, manipulate, or defraud or a showing of severe recklessness.  *Mizzaro*, 544 F.3d at1238.  The Eleventh Circuit limits severe recklessness to

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Bryant*, 187 F.3d at 1282 n. 18 (citation and quotation marks omitted).  Accordingly, to recover in a private securities action, a plaintiff must prove that a defendant made a material misstatement *with an intent to deceive* – not merely innocently or negligently.  *Merck & Co. v. Reynolds*, 130 S.Ct.

---

[9]  Furthermore, although Plaintiff does not address the argument, to the extent that Defendants' October 28, 2011, statement regarding the 2011 Business Model could be construed as a forecast of future enrollment, a construction with which Defendants disagree, that statement was accompanied by repeated meaningful cautionary statements identifying other factors which could cause actual results to differ from the 13% during the conference call occurring the following day.  Ostler Declaration, Exhs. 17, 21, 22.  The 2011 Business Model would thus constitute a forward-looking statement within the safe-harbor provision of the PSLRA.  15 U.S.C. § 78u-5(c)(1) (defining a forward-looking statement).  Plaintiff's conclusory allegations to the contrary do not persuade otherwise.  *See* Amended Complaint ¶ 250-51.

1784, 1796 (2010) (emphasis in original).

In pleading scienter, the plaintiff must allege facts supporting a strong inference of scienter for each defendant as to each violation, *Mizzaro*, 544 F.3d at 1238, with any omissions and ambiguities weighing against inferring scienter. *Tellabs*, 551 U.S. at 326. A plaintiff alleging fraud in a private securities action "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 551 U.S. at 328 (emphasis in original). Indeed, a strong inference of scienter in this context means "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *Thompson*, 610 F.3d at 633. To determine whether the pleaded facts give rise to a strong inference of scienter, the court must therefore "engage in a comparative evaluation; it must consider, not only inferences urged by plaintiff ... but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. Essentially, a court considering a motion to dismiss must "carefully examine the complaint to determine whether the allegations, taken as a whole, create a cogent and compelling inference that the named defendants acted with the requisite scienter." *Mizzaro*, 544 F.3d at 1240. A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (footnote omitted). Unless a private securities plaintiff sets forth facts in the complaint showing that it is at least as likely as not the defendants acted with the relevant knowledge or intent, the claim will fail. *Merck*, 130 S.Ct. at 1796.

Plaintiff fails to plead a cogent and compelling theory that Defendants acted with the requisite scienter relating to the enrollment practices of Strayer employees. In the main, Plaintiff alleges Defendants knew, or were severely reckless in not knowing, about improper enrollment

practices. Plaintiff's allegations do not link the Individual Defendants to the alleged improper enrollment practices, however. In fact, the only allegations linking any Defendant to the enrollment process include the following:

59. According to CS 5, every day at 9 a.m., Regional Vice President Jim McCoy led a conference call of campus directors working in Region 2, which covers the East Coast. On occasion, Business Office Managers and Admissions Managers joined the call. The sole purpose of the call "was to beat you up on the [enrollment]. We would sit there with our jaws open, not believing the way we were being spoken to. The tone was adversarial and berating. It created constant stress and anxiety."

60. According to CS 5, McCoy was responding to pressures from Defendant McDonnell to whom McCoy reported. McCoy "said on more than one occasion during the calls that Karl McDonnell was going to have his head if we didn't make the numbers." Additionally, CS 5 noted that whenever the campus hit its semester targets, administrators would receive an email of commendation from Defendant McDonnell praising them for making the numbers.

61. CS 1 stated that he was aware of two regional conference calls in January 2008 and July 2009, where Defendant McDonnell joined the call to question certain campuses about why they were behind in enrollment numbers.

***

102. According to CS 15, during August/September 2010, Defendant McDonnell came to Strayer University in Fredericksburg, Virginia and held a campus-wide meeting with the staff. At the meeting, Defendant McDonnell said: "Strayer is now looking at the admissions side to generate more quality [students] than quantity." CS 15 recalled that Defendant McDonell referenced the federal government's ongoing scrutiny of practices at for-profit schools at the meeting and said that Strayer wanted to cut its heavy reliance on tuition revenue from students supported by financial aid. The message that CS 15 took away from Defendant McDonnell's speech was "that we were going to move away from the numbers [enrollment quotas] and focus more on recruiting students who were really wanting to educate themselves.

103. CS 15 said that as a result of Defendant McDonnell's new directive, the Business Office" saw a lot less students coming through the door" after August/September 2010.

Amended Complaint ¶¶ 59-61, 102-04. These allegations merely show that McDonnell sent

congratulatory e-mails when administrators met or exceeded enrollment goals, inquired as to the reasons goals were not met and announced to one campus that Strayer wanted to obtain more quality students. As Defendants note, however, there are no allegations that any CS or other Strayer employee ever informed either McDonnell, Silberman or Brown that the enrollment performance goals could not be achieved without the use of improper practices or that the goals had been achieved by using such practices (doc. 44 at 17). The Amended Complaint does not contain any allegations indicating or detailing red flags that should have alerted the Individual Defendants to any purported wrongdoing by its employees or that the statements made in Strayer's communications to the public regarding enrollment presented a danger of being misleading or fraudulent. *See In re Pegasus Wireless Corp. Secs. Litig.*, No. 07-81113-CIV, 2009 WL 3055205 *6-*7 (S.D. Fla. Sept. 21, 2009) (finding a plaintiff failed to plead facts giving rise to an inference of scienter with the requisite particularity required by the PSLRA where, among other things, the complaint did not contain allegations regarding red flags or anything indicating that the company's public statements were misleading). The allegation that a regional vice president put "pressure" on employees to meet their performance goals and an employee interpreted that to mean recruitment and enrollment of students "by any means necessary" does not create a cogent and compelling inference that the Individual Defendants mandated the use of improper practices or were severely reckless in not knowing that a handful of employees engaged in such practices. *See* Amended Complaint ¶ 65.

Notably, Plaintiff sets forth no allegations that any Defendant communicated to employees instructions regarding the use of improper enrollment practices or ordering them to implement such practices. Indeed, none of the CS statements allege any of the Individual Defendants discussed improper enrollment practices with them or other Strayer employees, ordered them to engage in

those practices or knew Strayer employees used such practices. For example, CS 4, an Associate Director of Admissions at Strayer for 3 years, who provided coaching, training and guidance to admissions managers, fails to allege any communications such as e-mails, memos or letters from the Individual Defendants regarding the use of improper enrollment practices to achieve performance goals. Amended Complaint ¶¶ 32, 49, 110. Had any of the Individual Defendants communicated such information, it is reasonable to conclude that CS 4 would have stated so explicitly. The absence of such allegations, therefore, weighs against an inference of scienter. *Mizzaro*, 544 F.3d at 1247, 1250. Accordingly, none of the CS statements create an inference, much less a cogent and compelling inference, that Defendants encouraged, mandated, knew of or should have known of improper recruitment and enrollment practices.

Moreover, beyond the allegations pertaining to McDonnell, the allegations purporting to connect Silberman or Brown to any recruitment or enrollment practices encouraged or implemented by Strayer are even more attenuated. The only allegations Plaintiff sets forth regarding Silberman and Brown relate to statements made by Silberman regarding his and Brown's review of enrollment numbers prior to conference calls regarding quarterly earnings. *See, e.g.,* Amended Complaint ¶¶ 132, 146. The fact that Silberman and Brown reviewed enrollment numbers prior to conference calls with investors does not create a cogent and compelling inference that Silberman or Brown knew or should have known that some of those enrollments had been procured by improper means.

Further, drawing the inference Plaintiff posits, *i.e.*, that Defendants sought to improve Strayer's enrollment and recruiting standards to attract more quality students rather than focus on quantity of students, Plaintiff's arguments are still unpersuasive. *See* Amended Complaint ¶¶ 101-12. Mainly, even if McDonnell instructed employees in August or September 2010 that Strayer

would now emphasize "quality over quantity," the shift of focus to attracting quality students does not create a cogent and compelling inference that prior to the GAO report Strayer implemented a company-wide policy of recruiting unqualified students or engaging in abusive or improper recruiting and enrollment practices. The most compelling inference is that Strayer made a strategic business decision to shift focus to the quality of students enrolled in its programs to improve upon the quality of the service offered by Strayer. Incremental improvements to business operations and decisions made to improve the quality of a business's product or service constitute good management, not fraud. *Mizzaro*, 544 F.3d at 1253-54, 1257. Furthermore, a general allegation regarding a solitary statement made by McConnell without giving the context of the statement does not establish scienter. *See Garfield*, 466 F.3d at 1265 (finding that a general allegation that the individual defendants promoted channel stuffing at a series of meetings does not establish scienter).

As further purported evidence of scienter, Plaintiff alleges the Individual Defendants engaged in suspicious stock sales. Amended Complaint ¶¶ 205-17. As the Eleventh Circuit has recognized, the timing of stock trades by insiders may prove relevant to inferring scienter. *Mizzaro*, 544 F.3d at 1253. Stock sales or purchases timed to maximize returns on undisclosed, inside information weigh in favor of inferring scienter while the lack of such sales weighs against inferring scienter. *Id.* To rely on stock sales to infer fraudulent intent, a plaintiff must allege facts showing the stock sales were unusual or suspicious. *Durham v. Whitney Info. Network, Inc.*, No. 06-cv-00687, 2009 WL 3783375 *17 (M.D. Fla. Nov. 10, 2009); *In re AFC Enterprises, Inc. Secs. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004). In making this determination, the courts look to such factors as: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Durham*, No. 06-cv-00687, 2009

WL 3783375 * 17(citing *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303–1304 (S.D. Fla. 2002)).

In the Amended Complaint, Plaintiff alleges the Individual Defendants were financially motivated to commit the purported wrongdoing because, during the class period, they sold 400,885 shares of Strayer common stock for proceeds of $79,408,744.30 while in possession of materially adverse, inside information. Amended Complaint ¶ 205. According to Plaintiff, the majority of stock sales occurred after Strayer issued press releases reporting high enrollment numbers and were inconsistent with the Individual Defendants' prior trading patterns. *See* Amended Complaint ¶¶ 207-15. The premise for Plaintiff's argument lies in its assertions that

> 203. As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants participated in the fraudulent scheme and course of conduct alleged herein, by virtue of their receipt of information reflecting the true facts regarding Strayer, their control over Strayer and the materially false and misleading misstatements alleged herein and/or their associations with the Company, which made them privy to confidential proprietary information concerning Strayer.

> 204. The foundation for Strayer's business of educating students is, and was, enrolling students. Strayer generates the overwhelming majority (in excess of 95%) of its revenue through student enrollments. Student enrollments are so vital to Strayer's business and operations that this metric formed the core of Strayer's publicly disclosed business model. Defendants monitored and tracked student enrollment rates and highlighted student enrollment rates in both press releases and conference calls. Accordingly, Defendant Silberman as Chairman of the Board and Chief Executive Officer; Defendant McDonnell as President and Chief Operating Officer; and Defendant Brown as Executive Vice President and Chief Financial Officer, are deemed to have knowledge of the facts and circumstances concerning enrollment rates.

*Id.* at ¶¶ 203-04. As set forth in greater detail above, the allegations in the Amended Complaint do

25

not support the assertions that Strayer engaged in widespread improper recruitment or enrollment practices; that Defendants encouraged, mandated or had knowledge of any improper recruitment or enrollment practices; or that the enrollment numbers or other information disseminated by Defendants were in any way false or misleading. Given the lack of support for Plaintiff's assertions, scienter cannot be inferred from the fact that the Individual Defendants sold shares after press releases announcing strong enrollment numbers because Plaintiff has not demonstrated any inside information existed. Indeed, the Amended Complaint shows that, after issuance of the press releases, investors had the same information as the Individual Defendants and could buy or sell stock accordingly.

Notwithstanding, Plaintiff's allegations regarding the timing of the stock sales weigh heavily against an inference of scienter. Indeed, "[s]ignificant gaps in time between a sale of stock and the announcement causing the stock price to decline may diminish the likelihood of scienter." *In re AFC Enterprises, Inc. Secs. Litig.*, 348 F. Supp. 2d at 1373. Plaintiff alleges Defendants changed their enrollment practices after the GAO report issued in August 2010 and that as a result of the revelation of those changes the price of Strayer common stock plummeted on January 10, 2011. Notably, although the Individual Defendants may have sold high volumes of shares on occasion, all of Silberman's stock sales occurred in 2008; all but one of Brown's stock sales occurred from December 2007 through August 2009 with one sale, his smallest of the period, occurring in February 2010; and both of McDonnell's sales occurred in 2010 but prior to the issuance of the GAO report or any purported revelations. Amended Complaint ¶¶ 205-17. Accordingly, none of Silberman's or Brown's sales occurred at or near the time of the announcement causing the stock price to decline and thus diminishes Plaintiff's claim of scienter as to both Silberman and Brown. Significantly, the

only sale occurring remotely close to either the issuance of the GAO report or the revelations of truth alleged by Plaintiff on October 28, 2010, January 7, 2011, or January 10, 2011, was McDonnell's July 30, 2010, sale. As Defendants argue, however, nothing in the Amended Complaint indicates McDonnell knew when the GAO would issue its report. The fact that the report issued the week following McDonnell's July 30, 2010, stock sales does not render McDonnell's stock sales the week prior suspicious or unusual.[10]

Plaintiff also alleges the Individual Defendants' sale of stock on certain days comprised a material percentage of the total Strayer trading volume of the day. Amended Complaint ¶ 216. On only two dates during the class period, both of which occurred in 2008, did the Individual Defendants' sales comprise more than 20% of the market volume of sales for the day. *Id.* On seven of the nine other dates identified by Plaintiff, the Individual Defendants' sales consisted of less than 10% of the total market volume for the day. *Id.* In addition, all but one of those stock sales occurred from December 2007 through August 2009. Based on the allegations set forth in the Amended Complaint, therefore, the amount of and timing of the sales of stocks by the Individual Defendants are not suspicious or unusual. Accordingly, the Individual Defendants' stock sales do not create a cogent and compelling inference of scienter.[11]

_____

[10] Furthermore, as to McDonnell, his Form 4s indicate his only two sales of stock during the class period, both of which occurred in 2010, represent amounts sold to cover the taxes owed as a result of vesting of previously granted shares of restricted stock. Ostler Declaration, Exhs. 28A and 28B. Forfeiture of a small percentage of stock for tax withholding purposes does not support an inference of scienter. *In re Sportsline.com Secs. Litig.*, 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004). As such, Plaintiff has not sufficiently supported an inference of scienter as to McDonnell with respect to his stock sales.

[11] Based on the allegations in the Amended Complaint, it is difficult to ascertain whether the Individual Defendants' sale of stock during the class period as compared to their trading history was suspicious or unusual. The class period stretches for four years yet Plaintiff

### c. Loss Causation

As with the other two factors, Plaintiff has failed to sufficiently plead that any action or omission of Defendants caused the loss for which Plaintiff seeks redress. With respect to loss causation, the burden remains on the plaintiff of proving each of defendant's alleged misrepresentations or omissions proximately caused the loss for which the plaintiff seeks to recover. 15 U.S.C. § 78u-4(b)(4); *Dura*, 544 U.S. at 345-46; *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)("In other words, loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss" (internal quotations and citation omitted)). To state an actionable federal securities fraud claim, therefore, the plaintiff must adequately allege and prove the traditional elements of causation and loss. *Dura*, 544 U.S. at 346. Essentially, "'a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *In re TECO Energy Inc. Securities Litigation*, 8:04-cv-1948-T-27EAJ, 2006 WL 845161 *2 (M.D. Fla. March 30, 2006) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). A plaintiff may not establish loss causation by simply alleging a security was purchased at an artificially inflated price, however. *Dura*, 125 S.Ct. at 1631-32. Instead, a plaintiff must allege a link of a specific disclosure or revelation of truth to the market regarding specific statements or omissions made by a defendant that is in some way connected with a drop in price for a security. *TECO*, 8:04-cv-1948-T-27EAJ,

---

compares the amount of sales during the class period to the amount of sales occurring during the one-year period prior to the start of the class period. The more appropriate and illustrative comparison would entail the amount of stock sales made by each Individual Defendant during the four-year period prior to the class period to the amount of stock sales made during the four-year class period.

2006 WL 845161 *2. Although a plaintiff need not show the defendant's act or omission constituted the sole and exclusive cause of the loss suffered, the plaintiff must show that it was substantial, meaning a significant contributing cause. *Robbins*, 116 F.3d at 1447.

Defendants contend Plaintiff has failed to properly allege loss causation because Plaintiff has failed to demonstrate that any disclosures by Defendants revealed improper conduct at Strayer which thereby caused the loss for which Plaintiff seeks redress. Here, Plaintiff focuses its allegations as to the purported revelation of truth regarding enrollment practices at Strayer on statements made in the October 28, 2010, press release; the January 7, 2011, press release; and the January 10, 2011, conference call. *See* Amended Complaint, ¶¶ 192-202. Specifically, Plaintiff alleges the following:

> 194. The announcement that "new student enrollments decreased 2% during the third quarter" partially revealed that Strayer's enrollments were affected by the Company's internal reforms. This announcement, however, failed to reveal that the Company had reformed its enrollment practices due to government scrutiny of for-profit schools and the full extent the reforms were having on student enrollments.

> 195. Because Defendants continued to mislead the public about student enrollments and shrouded the news with the announcement that they planned to increase Strayer's share buyback plan to authorize repurchase of up to $150 million of Strayer common stock for the next fourteen months, and increase "the Company's annual dividend by 33% to $4.00 per share from $3.00 per share," the price of Strayer common stock rose from the prior day's trading. The Company's positive news (e.g., share buyback and dividend payment) indicated that it did not have the same issues as other for-profit schools in the sector, such as Apollo Group, Inc.[,] the largest for-profit education company, which pulled its fourth quarter guidance on August 13, 2010. As a result of the false and misleading statements, the market artificially inflated the price of Strayer common stock.

> ***

> 202. As a result of the Company's disclosures on January 7, 2011[,] and January 10, 2011[,] investors realized that Strayer had serious recruitment and enrollment issues and that prior enrollment figures were the result of improper enrollment practices. On January 10, 2011, the price of Strayer common stock fell to $118.60 per share from a closing price of $153.24 per share on January 7, 2011[,] on unusually high trading volume of 3,037,400.

*Id.* at ¶¶ 194-95, 202.  Importantly, however, Defendants never mention a change in enrollment practices in any of the statements made on those three dates nor do those statements reveal any omissions about the recruitment and enrollment practices at Strayer.

Indeed, on October 28, 2010, Strayer issued the press release announcing its third quarter 2010 revenues and earnings and fall term 2010 enrollments.  Amended Complaint ¶ 192-95; Ostler Declaration, Exh. 16.  As to student enrollments, Strayer announced

> Enrollment at Strayer University for the 2010 fall term increased 12% to 60,711 students compared to 54,317 students for the same term in 2009.  Across the Strayer University campus and online system, continuing student enrollments increased 17% while new student enrollments decreased 2%.  Global online students increased 18%.  Students taking 100% of their classes online (including campus based students) increased 7%.  The total number of students taking at least one class online increased 11% to 43,255.

Amended Complaint ¶ 192; Ostler Declaration, Exh. 16.  Strayer also announced its 2011 Business Model stating

> The Company announced today that Strayer University is implementing a 5% tuition increase effective January 2011.  The Company also announced today that Strayer University intends to open eight new campuses in 2011.  Taking into account this investment plan for 2011, and assuming a 13% increase in annual student enrollment at Strayer University in 2011, the Company would then expect a 17-18% increase in revenue, roughly stable operating margins, and diluted earnings per share in the $11.30 to $11.50 range for 2011.  Included in this range is the Company's estimate of approximately $0.55 per share after tax stock-based compensation expense and an effective tax rate of 39.5%.

Amended Complaint ¶ 192; Ostler Declaration, Exh. 16.  In that press release, Strayer also announced its Board of Directors increased the annual dividend by 33% to $4.00 per share from $3.00 per share and amended the share repurchase program to authorize the repurchase of up to $150 million in value of Strayer common stock over the following 14 months.  Amended Complaint ¶ 195; Ostler Declaration, Exh. 16.

On January 7, 2011, Strayer issued the press release announcing its winter term 2011

enrollments and provided additional information regarding its 2011 Business Model. Amended

Complaint ¶ 196; Ostler Declaration, Exh. 18. As to student enrollment, Strayer reported

> Enrollment at Strayer University for the 2011 winter term increased 4% to approximately 57,300 students compared to 55,106 students for the same term in 2010. Across the Strayer University campus and online system, continuing student enrollments increased by approximately 10%, while new student enrollments decreased by approximately 20%.

Amended Complaint ¶ 196; Ostler Declaration, Exh. 18. Additionally, Strayer recognized it had

announced its 2011 Business Model in October premised upon a 13% increase in annual student

enrollment. Given the enrollment growth percentage reported for the 2011 winter term, Strayer

provided investors with an updated 2011 Business Model, which assumed enrollment growth

numbers of -5% growth, 0% growth, and 5% growth as compared to the original assumption of 13%

growth. Amended Complaint ¶ 196; Ostler Declaration, Exh. 18. Strayer also announced it would

hold a conference call on January 10, 2011, to discuss enrollment at Strayer University for the 2011

winter term and its 2011 Business Model. Ostler Declaration, Exh. 18.

On January 10, 2011, Strayer held its conference call with investors. Amended Complaint

¶¶ 198-99; Ostler Declaration, Exh. 19. During the January 10, 2011, conference call, Silberman

opened with prepared remarks during which he stated, in relevant part,

> Now last October Mark [Brown] and I provided our 2011 business model, which showed that, based on our planned investments in Strayer University in 2011, as well as our 5% tuition increase effective January 1st of this year, a 13% average enrollment growth for 2011 would generate 17 to 18% revenue growth and roughly stable operating margins.

> Now each year, our rate of average annual enrollment growth is significantly affected by our rate of new student growth, both in the previous fall term, as well as the rate of new student growth in the current year's winter term; that's essentially when the pipeline for the academic year is loaded. Now therefore, with the 20% decline in new students for the 2011 winter term, which we just announced, compounding our 2% decline in new students for the 2010 fall term, our purpose in both Friday's release and on this morning's call is to share with you the projected impact of what lower rates of enrollment growth for the full year might have

on our business model.

Included in Friday's release, our business model scenario's [sic] based on three different enrollment assumptions for the full year of 2011. Now, these three scenarios are plus 5% growth, flat enrollment and minus 5% growth. We, of course, have no idea what our actual enrollment growth for the full year will ultimately be, but these three scenarios roughly correspond with the following general outcomes.

First, if our winter term enrollment metrics continue without improvement through the rest of the year, i.e., a 20% decline in new students each term, and a 200 basis point decline in continuation rates, we project our total average student enrollment for 2011 would be approximately 5% less than 2010.

Now, second, if our new student enrollment for the rest of 2011 is flat versus 2010, and we continue to have 200 basis points of decreased continuation rates each quarter versus the prior year, our total average student enrollment for 2011 would be roughly equal to 2010.

And finally, if our new student enrollment for the final three academic terms of 2011 resumes at least double-digit growth, and our continuation rates are flat versus last year, we would expect at least 5% enrollment growth for 2011 over 2010.

Now – this now gives you the same visibility into our financial model that Mark and I have, and we will share with you our enrollment statistics for the upcoming spring, summer, and fall academic terms on our normal announcement schedule.

Amended Complaint ¶ 198; Ostler Declaration, Exh. 19. Following his opening statements, a question-and-answer session ensued. Ostler Declaration, Exh. 19. During the question-and-answer session, Silberman repeatedly pointed to the negative publicity and government activity as key factors impacting the immediate negative enrollment numbers. *See id.* at 2-3, 5, 14, 16, 17. Further, Silberman repeatedly reiterated that Defendants could not forecast student enrollment nor attempted to in their communications with investors. *See, e.g.*, *id.* at 6, 12.

Whether taken individually or collectively, these statements do not reveal that Strayer engaged in improper recruitment and enrollment practices, that those alleged improper practices either bolstered or were intended to bolster student enrollment numbers, that prior student enrollment

numbers were the result of improper recruitment and enrollment practices, that Strayer implemented internal reforms as to the alleged improper practices, or that any such reforms affected enrollment numbers. Instead, the statements reflect the economic and financial climate Defendants encountered and the assessment of Strayer's position in it. If anything, the statements indicate Strayer believed any decline in enrollment derived from the negative press surrounding the government activity with respect to the for-profit secondary education industry not any changes in its recruitment or enrollment practices. *See id.* at 2-3, 5, 14, 16, 17. These statements do not lead to the conclusion Plaintiff asks the Court to reach, namely that Defendant's admission that Strayer's enrollments were effected by "governmental activity" revealed that Strayer's enrollment practices had not previously conformed with the government standards, as codified in the Higher Education Act or Strayer's internal code of ethics, or that Defendants modified Strayer's enrollment practices because of government scrutiny. *See* doc. 52 at 19. Accordingly, as nothing in the statements corrects any prior disclosures by or reveals any omissions on the part of Defendants which negatively affected the price of Strayer common stock, Plaintiff has failed to adequately allege loss causation.

### 2. Section 20(a)

Plaintiff also asserts a claim under § 20(a) of the Securities Exchange Act against the Individual Defendants as purported control persons. *See* 15 U.S.C. § 78t(a). Section 20(a) creates a cause of action imposing derivative liability upon persons who control primary violators of the Act, *Mizzaro*, 544 F.3d at 1237, and provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the

violation or cause of action.

15 U.S.C. § 78t(a).  To state a claim under § 20(a), Plaintiff must allege: (1) Strayer committed a primary violation of the securities laws; (2) the Individual Defendants possessed the power to control the general business affairs of Strayer; and (3) the Individual Defendants possessed the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.  *Mizzaro*, 544 F.3d at 1237.  Since a primary violation of the securities laws constitutes an essential element of a § 20(a) derivative claim, a plaintiff adequately pleads a § 20(a) claim only where the plaintiff adequately pleads a primary violation.  *Mizzaro*, 544 F.3d at 1237.  Given Plaintiff's failure to adequately plead a violation of § 10(b) and Rule 10b-5, I recommend the motion to dismiss be granted as to Plaintiff's § 20(a) control-person claim for failure to state a claim. *See Mizzaro*, 544 F.3d at 1255; *Thompson*, 610 F.3d at 635-36.

D.  Conclusion

For the foregoing reasons, it is hereby

RECOMMENDED:

1.  Defendants' motion to dismiss the amended complaint (doc. 44) be granted.

IT IS SO REPORTED in Tampa, Florida, on January 3, 2012.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).

cc:     The Honorable Steven D. Merryday
        Counsel of Record